# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

N° 08 Civ. 2437 (RJS)

ELLINGTON CREDIT FUND, LTD., *ET AL.*,

Plaintiffs,

VERSUS

SELECT PORTFOLIO SERVICING, INC., *ET AL.*,

Defendants.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: *12/5/11*

## OPINION AND ORDER
December 2, 2011

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Ellington Credit Fund, Ltd., and ECF Special Securities, LLC – two hedge funds that invested in a series of mortgage-backed securities – bring this diversity action against Defendants Manufacturers and Traders Trust Company ("M&T"), Select Portfolio Servicing, Inc. ("SPS"), and various affiliated entities of SPS ("SPS Affiliates"). Plaintiffs allege that Defendants breached various contractual, fiduciary, and common law obligations by mismanaging the mortgages held by the securitization trusts, engaging in self-dealing, and misrepresenting their deficient oversight of these assets. Before the Court are Defendants' motions to dismiss the First Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motions are granted in part and denied in part.

## I.  BACKGROUND

### A.  Facts[1]

#### 1.  The Securitizations

Beginning in 1997 and continuing through 1998, ContiFinancial Corporation, ContiWest Corporation, and their affiliates and subsidiaries (collectively "Conti") sponsored a series of twenty-one real estate mortgage investment conduit ("REMIC") securitization trusts. (FAC ¶¶ 13, 19.) A REMIC trust consists of a pool of mortgages – in this case, loans originated by Conti (*id.* ¶ 12) – the beneficial ownership of which has been sold to various investors in the form of certificates representing their undivided ownership interest in the total pool. The purchasers of these certificates (referred to as "owners" or

---

[1] Unless otherwise noted, the following facts are derived from the First Amended Complaint ("FAC" or "Complaint").

"certificateholders") are entitled to a share of the principal and interest received by the trusts from the mortgage loans. (*Id.* ¶¶ 12, 14.) The certificates in this case were structured in various classes of interests, ranging from senior certificates, which offered the highest priority of repayment, down to "residual" or "Class R" certificates, which were entitled to essentially any left-over proceeds, and were the first to absorb any losses from defaults on the underlying home mortgages. (*Id.* ¶ 12.) Conti initially held the Class R certificates of the securitizations, but it declared bankruptcy in May 2000, and in December 2004, Plaintiffs acquired many of the Class R certificates from Conti's bankruptcy estate. (*Id.* ¶ 58.)

Each trust was governed by a Pooling and Servicing Agreement ("PSA") between Conti as Servicer (as well as other affiliates not relevant here) and M&T as Trustee.[2] The PSA established the responsibilities of the Servicer, who was required to collect payments due under the loans, enforce the terms of the mortgages, maintain and market properties for foreclosure, and remit the loan payments and proceeds to the Trustee. (FAC ¶ 14.) Likewise, the PSA set out the duties of the Trustee, who was charged with holding the mortgages in trust for the benefit of the certificateholders and distributing the proceeds to them. (*Id.*) Although the various certificateholders did not execute the PSA, it also set out their rights and powers and recognized them as the beneficiaries of the agreement. (*See* PSA § 11.09.)

On May 17, 2000, following Conti's bankruptcy filing, SPS assumed Conti's servicing obligations subject to the PSA.[3] (FAC ¶ 31.) On the same date, Conti, M&T, and MBIA Insurance Corporation – which insured the performance of certain categories of senior certificates – entered into a Side Servicing Agreement that amended ten of the twenty-one PSAs to include additional servicing standards. (*Id.* ¶ 32 & n.3.)

### 2. SPS's Misconduct

According to the Complaint, SPS subsequently engaged in various dishonest and illegal practices while servicing the mortgage loans. (*Id.* ¶ 36.) Specifically, the Complaint alleges that SPS "manufactured defaults" in order to charge mortgage borrowers illegitimate fees for property inspections, home insurance policies, legal services, and late payments, among others. (*Id.*) Pursuant to the PSA, the Servicer was responsible for initial payment of "all [of its] 'out-of-pocket' costs and expenses incurred in the performance of its servicing obligations," referred to as "servicing advances." (PSA § 8.09(b).) However, because SPS was entitled to reimbursement for its servicing advances from either (1) the monthly cash flow collected from the borrowers, or (2) the liquidation proceeds of a loan in foreclosure, SPS and its various "dummy subsidiaries" allegedly performed unnecessary or fictional services to inflate the fees and costs subject to reimbursement. (FAC ¶ 36.) These practices increased the amount of unpaid balances remaining on mortgage loans following foreclosure – called "deficiency balances" – and reduced the proceeds available to the trusts and certificateholders. (*Id.* ¶¶ 36-37.)

---

[2] Although each trust was established by the execution of a separate PSA, the PSAs contain substantially similar terms. (FAC ¶ 20.) Accordingly, the Court will quote from the PSA for Trust 1998-2, as does the Complaint. (*Id.*)

[3] At the time, SPS was named Fairbanks Capital Corporation. The company changed its name to SPS in 2004. (FAC ¶ 3.)

In the fall of 2002, the Federal Trade Commission ("FTC") began an investigation of SPS's servicing practices. (*Id.* ¶ 43.) At the same time, mortgage loan borrowers brought several class actions against SPS that were consolidated into a single class action in Federal Court in the District of Massachusetts under the caption *Curry v. Fairbanks Capital Corporation*, No. 03-10895-DPW. (*Id.*) The class actions alleged that SPS engaged in predatory practices, including failing to post payments, not accepting partial payments, improperly imposing force-placed insurance,[4] and "placing borrowers in default based on manufactured circumstances." (*Id.*) In November 2003, SPS agreed to a consent judgment with the FTC and settled the *Curry* class action. (*Id.* ¶ 44.) According to the Complaint, SPS was able to settle, in part, by voluntarily agreeing to curtail certain *legitimate* collection practices that were required by the PSA. (*Id.* ¶ 45.) For example, SPS agreed not to foreclose on defaulted loans until 92 days after default, even though the Fannie Mae Guidelines, which were incorporated by reference in the PSA, instructed servicers to initiate foreclosure only 60 days after default. (*Id.*) Plaintiffs claim that these settlements severely restricted SPS's ability to collect on the mortgages. As a result, collection rates plummeted, diminishing the assets of the securitizations. (*Id.* ¶ 54.)

Plaintiffs further allege that SPS made fraudulent misrepresentations to induce them to exercise certain redemption rights, or "clean-up calls," in three of the twenty-one trusts in 2005. (*Id.* ¶¶ 58-60.) Under the PSA, Class R certificateholders were permitted to purchase all of the assets of a trust from the other classes of certificateholders and terminate the trust. (*Id.* ¶ 58.) In exercising a clean-up call, however, Class R certificateholders were required to pay any unreimbursed, or "trapped," servicing advances to the Servicer. (*Id.*) Upon taking control of the mortgage loans following termination of the trusts, the certificateholders were free to appoint a different loan servicer or retain the existing servicer. (*Id.*) In February 2005, Plaintiffs exercised the clean-up call provision for the 1998-2 and 1998-3 Trusts, and did the same in October 2005 for the 1997-3 Trust.[5] (*Id.* ¶ 60.) Thereafter, Plaintiffs paid SPS approximately $37 million for trapped servicing advances and then chose to retain SPS to continue servicing the loans. (*Id.* ¶¶ 59-60, 134.) Plaintiffs were allegedly induced to make these clean-up calls by various false representations made by SPS regarding the legitimacy of its servicing advances and the potential recovery rates for outstanding deficiency balances on the loans. (*Id.* ¶¶ 59-60, 133-135.) Subsequently, Plaintiffs learned that many of the deficiency balances on the loans were uncollectible from the mortgage borrowers, allegedly as a result of SPS's neglect and poor servicing practices. (*Id.* ¶ 63.)

3.    The SPS Affiliates' Misconduct

Defendants Mountain West Realty Corporation ("Mountain West"), Residential Real Estate Services, Inc. ("Residential"), Alta Real Estate Services, Inc. ("Alta"), and

---

[4] When a mortgage borrower does not obtain her own home insurance, the servicer is permitted to purchase – and seek reimbursement for – insurance on the property. (*Id.* ¶ 40.)  This insurance, called force-placed or lender-placed insurance, is generally substantially more expensive than traditional homeowners' policies. (*Id.*)

[5] The Court refers to these three former securitizations as the "called securitizations," in contrast with the eighteen remaining "uncalled securitizations."

Pelatis Insurance Agency Corporation ("Pelatis") (collectively, the "SPS Affiliates") are all companies organized and controlled by SPS, based out of SPS's office in Salt Lake City, Utah, that were allegedly complicit in SPS's wrongful conduct. (*Id.* ¶¶ 6-9, 38-42, 64-91.) According to the Complaint, the SPS Affiliates participated in schemes with SPS to charge unearned fees to the securitizations and homeowners, but performed no actual services that can be verified or valued. (*Id.* ¶ 39.)

For example, Plaintiffs allege that SPS required real estate brokers responsible for selling the trusts' foreclosed properties to pay 25% of their sales commission to either SPS or Mountain West as a referral fee, despite the fact that Mountain West performed little or no work in connection with the sales. (*Id.* ¶¶ 39 & n.4, 67) Similarly, the Complaint alleges that SPS and Pelatis engaged in a scheme that funneled commissions for mandatory lender-placed home insurance to Pelatis. (*Id.* ¶¶ 40, 73.) Residential and Alta are likewise alleged to have engaged in a scheme with SPS to charge the trusts for an "excessive number" of broker price opinions and inspections on defaulted loans in the trusts. (*Id.* ¶ 74.)

#### 4. M&T's Misconduct

The allegations against M&T, as Trustee, largely arise out of its insufficient supervision of SPS, its failure to report SPS's misconduct to the owners, and its decision not to terminate SPS after SPS's alleged predatory and dishonest practices had come to light in the FTC and *Curry* settlements. (*Id.* ¶¶ 51-56.) According to the Complaint, M&T failed to remove SPS as Servicer even though it was permitted to do so after certain cumulative loss triggers enumerated in the PSA were exceeded. (*Id.*

¶ 71.) In addition, Plaintiffs allege that M&T engaged in "self-dealing" by arranging to be included in a global release reached in the *Curry* settlement. (*Id.* ¶ 51.)

#### B. Procedural History

Plaintiffs commenced this action by filing a Complaint in the 345th Judicial District Court for Travis County, Texas on April 17, 2007. Defendants removed the case to the United States District Court for the Western District of Texas on May 30, 2007, where it was assigned to the Honorable Lee Yeakel, District Judge. On June 13, 2007, Defendants moved to dismiss or transfer the lawsuit. Subsequently, on July 10, 2007, Plaintiffs filed the First Amended Complaint. The FAC contains no less than nineteen claims for relief, including breach of contract, unjust enrichment, breach of duty to disclose, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, fraud, negligent misrepresentation, negligence, conversion, money had and received, breach of duty of good faith and fair dealing, waste of collateral, and concealment. These claims are lodged on behalf of Plaintiffs' interests in the three called securitizations, as well as the remaining eighteen uncalled securitizations.

On August 3, 2007, Defendants again moved to dismiss or transfer the action. Defendants then filed a Joint Notice on August 10, 2007 withdrawing those portions of the prior motions to dismiss the original complaint "that raise[d] grounds for dismissal other than venue and choice of forum issues." On November 2, 2007, the Honorable Andrew W. Austin, Magistrate Judge, issued a Report and Recommendation in which he recommended that Judge Yeakel transfer this matter to this District pursuant to 28 U.S.C. § 1404(a). On February 21,

2008, after reviewing objections from the parties to the Report, Judge Yeakel transferred the matter to this District, where it was assigned to the undersigned. In the closing lines of his Order, Judge Yeakel stated that all motions not addressed therein, including the substantive motions to dismiss the FAC, remained pending.

Subsequently, upon Defendants' motions, the Court stayed discovery pending resolution of Defendants' motions to dismiss. The Court heard oral argument on October 23, 2009. On March 31, 2010, Plaintiffs and MBIA entered into a stipulation dismissing MBIA with prejudice.[6] The Court permitted the parties to submit letter briefs supplementing arguments made in the omnibus motions to dismiss and transfer this action, the most recent of which was submitted in March 2011.[7]

---

[6] Accordingly, Counts Three and Ten were dismissed in their entirety, as were those portions of Counts Two, Four, Fourteen, Eighteen, and Nineteen naming MBIA as a defendant.

[7] In resolving the instant motions, the Court has also considered M&T's Memorandum of Law in Support of the Motion to Dismiss the FAC ("M&T Mem."); SPS and SPS Affiliates' Memorandum of Law in Support of the Motion to Dismiss the FAC ("SPS Mem."); Plaintiffs' Opposition to M&T's Motion to Dismiss ("Pls. M&T Opp'n"); Plaintiffs' Opposition to SPS and SPS Affiliates' Motion to Dismiss ("Pls. SPS Opp'n"); Plaintiffs' Omnibus Opposition to the Motions to Dismiss the Original Complaint ("Pls. Omnibus Opp'n"), to the extent it was explicitly incorporated in subsequent briefing, M&T's Reply ("M&T Reply"); and SPS and SPS Affiliates' Reply ("SPS Reply"). Including the Complaint, motion papers, attached exhibits and declarations, and letter briefs, the parties have submitted no less than 1,000 pages of materials in connection with the pending motions to dismiss.

## II.   LEGAL STANDARD

Defendants move to dismiss the Complaint for lack of standing and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). By contrast, a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). If Plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III.   DISCUSSION

### A.   Choice of Law

Federal courts sitting in diversity apply state substantive law. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). In this case, each PSA contained a choice of law provision selecting New York law. (PSA § 11.11.) The choice of law provision is only designated, however, for construing the PSA and each certificate, and is silent

regarding the common law tort and fiduciary duty claims at issue here. (*Id.*) Regardless, the parties have relied on New York law in their briefs and at oral argument, which is sufficient to establish the governing law in this action. *See Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law." (internal quotation marks and citations omitted)). Accordingly, the Court will apply New York law in resolving Defendants' motions to dismiss.

### B.   Standing

#### 1.   M&T

M&T first argues that the Complaint should be dismissed for lack of standing. (*See* M&T Mem. 14-16.) Specifically, M&T contends that all of its alleged misconduct occurred prior to Plaintiffs' acquisition of the certificates in December 2004, and that, as a result, Plaintiffs cannot show that they suffered any injury traceable to M&T's actions. (*Id.*)

To establish standing, a plaintiff must allege that (1) it has suffered an injury in fact, (2) which is fairly traceable to the challenged action of the defendant, and (3) which is likely to be redressed by the requested relief. *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. The Supreme Court has commented that at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [a court] . . . presume[s]

that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561.

To demonstrate a justiciable injury, a plaintiff must allege "a distinct and palpable injury to himself," and "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 501 (1975). Nonetheless, a plaintiff generally has standing to pursue a cause of action that was properly assigned to him. *See Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 117 (2d Cir. 2002) ("[A] valid and binding assignment of a *claim* (or a portion thereof) – not only the right or ability to bring suit – may confer standing on the assignee." (emphasis in original)); *see also W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008); *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 151-53 (2d Cir. 1995). New York General Obligations Law ("N.Y. G.O.L.") § 13-101 allows certain causes of action to be freely assigned, provided that the assignment is express.[8] The transferor must make some statement or act to demonstrate its intent to transfer an accrued claim. *See Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 557 (2d Cir. 1976) ("[A]ny act or words are sufficient which 'show an intention of transferring the [cause of action] to the assignee.'" (quoting *Advance Trading Corp. v. Nydegger & Co.*, 127 N.Y.S.2d 800, 801 (Sup. Ct. 1953)). The Complaint's sole reference to the circumstances under which Plaintiffs obtained their certificates – "Plaintiffs acquired many of the Class R

---

[8] Any claim can be transferred pursuant to § 13-101 unless it is (1) a claim for personal injury, (2) founded upon a grant or interest in real property which is void by state statute, or (3) otherwise expressly forbidden by a federal or state statute or contravenes public policy. N.Y. G.O.L. § 13-101.

6

Certificates of the Securitizations from the Conti bankruptcy estate in December 2004" (FAC ¶ 58) – does not allege any express assignment of claims. Instead, Plaintiffs argue that upon purchasing their certificates, they automatically assumed Conti's accrued causes of action for harm to trust assets. (*See* Pls. M&T Opp'n 8 (citing Pls. Omnibus Opp'n 11-12).) According to Plaintiffs, such automatic assumption occurs by operation of both the general law of trusts and N.Y. G.O.L. § 13-107.[9] Defendants fail to respond to either argument. For the reasons that follow, the Court finds that Plaintiffs have standing to assert Conti's claims against M&T pursuant to § 13-107.

Upon a transfer of "bonds," § 13-107 automatically vests the transferee with all of the transferor's bond-related causes of action against the obligor, the indenture trustee or depositary, or the guarantor of the obligation. The statute provides,

> 1. Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, (a) for damages or rescission against the obligor on such bond, (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding, and (c) for damages against any guarantor of the obligation of such obligor, trustee or depositary.
>
> 2. As used in this section, "bond" shall mean and include any and all shares and interests in an issue of bonds, notes, debentures or other evidences of indebtedness of individuals, partnerships, associations or corporations, whether or not secured.
>
> 3. As used in this section, "indenture" means any mortgage, deed of trust, trust or other indenture, or similar instrument or agreement (including any supplement or amendment to any of the foregoing), under which bonds as herein defined are issued or outstanding, whether or not any property, real or personal, is, or is to be, pledged, mortgaged, assigned, or conveyed thereunder.

N.Y. G.O.L. § 13-107.

Section 13-107 thus "expressly permits a bondholder to sue an indenture trustee for breaches of duty that occur prior to his purchase of the bond, regardless of the bondholder's knowledge of these breaches." *LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 462 (2d Cir. 1999); *see Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 741 N.Y.S.2d 181, 183 (2002). ("[N]either the plain language nor the legislative history of General Obligations Law § 13-107 requires that a transferee demonstrate its own injury in order to bring a claim for damages.").

To the extent there is any question whether § 13-107 applies to the pass-through certificates at issue here, it is one to which Defendants offer no argument. The

---

[9] Plaintiffs do not bring any claims under the Trust Indenture Act or federal securities laws, which, unlike N.Y. G.O.L § 13-107, do not provide for the automatic assumption of a security seller's claims. *See Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey*, 85 F.3d 970, 973 (2d Cir. 1996) (finding § 13-107 is inapplicable to claims under Trust Indenture Act); *In re Saxon Sec. Litig.*, 644 F. Supp. 465, 474 (S.D.N.Y. 1985) (holding that Rule 10b-4 claims were not automatically assigned to purchasers of securities).

provision applies to "trusts" under which "bonds" are issued, including "any and all shares and interests in an issue of bonds, notes, debentures or other evidences of indebtedness of individuals, partnerships, associations or corporations, whether or not secured." N.Y. G.O.L. § 13-107 (2)-(3). Defendants do not argue that the certificates issued by the trusts pursuant to the PSAs are dispositively different from ordinary debt securities governed by § 13-107. Indeed, as many courts have observed, pass-through certificates are structurally similar in form and function to bonds issued under an indenture. *See, e.g.*, *Greenwich Fin. Servs. Distressed Mortg. v. Countrywide Fin. Corp.*, 654 F. Supp. 2d 192, 197 (S.D.N.Y. 2009) ("Where the indentures contain the details of the borrowing, the duties of the trustee, and the legal relationship between the trustee, borrower, and bondholders, the sample PSA . . . sets out the distribution of mortgage principal and interest payments to the various certificate classes, the duties of the trustee, and the legal relationship between the trustee, the master servicer, and the certificateholders." (internal citations omitted)); *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 200 (2d Cir. 2005) (noting, with respect to pass-through certificates issued by a trust governed by a PSA, "[i]t is these stakes – the 'bonds' or 'certificates' – that are ordinarily referred to as commercial mortgage-backed securities"); *Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890 (SAS), 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005) ("The holders of the certificates issued by the Trust are referred to as Certificateholders. These certificates are essentially bonds secured by a pool of commercial mortgages that the Trust has purchased from lenders"); *cf. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.,*

*LLC*, 479 F. Supp. 2d 349, 373-74 (S.D.N.Y. 2007) (stating that investors in a *hedge fund* which invested primarily in mortgage-backed securities could not assert standing under § 13-107).

Significantly, Plaintiffs acquired their certificates from Conti's bankruptcy sale in New York and Defendants do not contest that § 13-107 governs that transfer. *See Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.*, 06 Civ. 5246 (JGK), 2007 WL 950134, at *6 (S.D.N.Y. Mar. 28, 2007) (finding it "inappropriate to dismiss the claim predicated on § 13-107 at this stage where there is no showing that New York law did not govern each prior transfer of the [notes] at issue."). Accordingly, at this stage, the Court is satisfied that the certificates at issue are sufficiently analogous to bonds to warrant standing under § 13-107 for Plaintiffs' claims against M&T.[10]

---

[10] Relying on the Affidavit of Laurence Penn, M&T briefly argues that Plaintiffs do not have standing because they do not actually own their certificates directly, but through a subsidiary that owns 100% of the stock of the registered owners of the certificates. (*See* M&T Reply 2 (citing Pls. M&T Opp'n, Ex. A).) However, for the purpose of "ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint." *Warth*, 422 U.S. at 501. To the extent the Penn Affidavit, a document neither referenced in the Complaint nor integral to it, contradicts the Complaint's well-pleaded allegation that Plaintiffs – rather than some other entity – acquired these certificates (*see* FAC ¶ 58), it would not be proper for the Court to consider it at this stage unless it gave the parties notice that the motion to dismiss is being converted into a motion for summary judgment under Rule 56 and an opportunity to respond with appropriate evidence. *Baptiste v. Sennet & Krumholz*, 788 F.2d 910, 911 (2d Cir. 1986).

### 2.  SPS and the SPS Affiliates

However, Plaintiffs fail to plausibly allege standing for claims against SPS and the SPS Affiliates that accrued prior to Plaintiffs' purchase of the certificates, a deficiency the Court must address *sua sponte*. *See United States v. Hays*, 515 U.S. 737, 742 (1995) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-231 (1990))).  By its terms, § 13-107 is plainly limited to claims against the obligor, the indenture trustee or depositary, or the guarantor of the obligation.  *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F. Supp. 1199, 1209 (S.D.N.Y. 1994).  Here, it is clear that SPS and the SPS Affiliates are not obligors, depositaries, or guarantors and thus § 13-107 does not confer standing on Plaintiffs to advance Conti's accrued claims.

Plaintiffs' other argument, that they have standing as successor beneficiaries of a trust pursuant to common law trust principles, is unavailing.  As Plaintiffs' own authorities reflect, the use of commercial trusts as securitization vehicles, as here, necessarily requires the application of specialized law distinct from generalized trust principles. *See, e.g.*, 1 Austin W. Scott, The Law of Trusts §2.1.22 (5th Ed. 2006) ("The use of trusts in security transactions involves the general principles that apply to such transactions.  Thus the ordinary principles of trust law do not always apply.  Accordingly, none of the Restatements of Trusts addresses the rules applicable to a deed of trust to secure debt obligations.  Neither does this treatise.").  Moreover, even if common law trust principles applied here, Plaintiffs have not cited any authority for the proposition that a transferee of an interest in a trust automatically assumes all of the transferor's claims against parties *other than the trustee*, such as SPS and the SPS Affiliates.  (*See, e.g.*, Pls. Omnibus Opp'n 11 (citing *Mfrs. Trust Co. v. Kelby*, 125 F.2d 650, 653 (2d Cir. 1942) ("[I]f the *trustee* could . . . have been shown to have misappropriated any of the trust res, the right of action to compel restoration would have passed with an assignment for the bonds, being regarded as an incident or part of the res itself" (emphasis added)).)  Therefore, in the absence of a plausible allegation that Plaintiffs were expressly assigned claims against SPS and the SPS Affiliates, all claims premised on these entities' misconduct prior to Plaintiffs' December 2004 purchase of the relevant pass-through certificates are dismissed for lack of standing.

### C.  Contractual Prerequisites for Filing Suit

#### 1. Application of § 6.07

Defendants argue that this action should be dismissed in its entirety because Plaintiffs have not complied with the prerequisites for filing a suit set forth in § 6.07 of the PSA.  That section, commonly referred to as a "no-action clause," provides, in relevant part:

> No owner shall have any right to institute any proceeding, judicial or otherwise, with respect to this Agreement, the Insurance Agreement, the Indemnification Agreement or the Certificate Insurance Policies or for the appointment of a receiver or trustee of the Trust, or for any other remedy with respect to an event of default hereunder, unless:

(1) such Owner has previously given written notice to the Depositor, the Certificate Insurer and the Trustee of such Owner's intention to institute such proceeding;

(2) the Owners of not less than 25% of the Percentage Interests represented by the Class A and Class B Certificates then Outstanding or, if there are no Class A or Class B Certificates then Outstanding, by such percentage of the Percentage Interests represented by the Class R Certificates, shall have made written request to the Trustee to institute such proceeding in its own name as Trustee establishing the Trust;

(3) such Owner or Owners have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such requests; [and]

(4) the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute such proceeding . . . .

(PSA § 6.07.)

The purpose of no-action clauses like § 6.07 is to protect the securitizations – and in turn other certificateholders – from the expense of litigating an action brought by a small group of certificateholders that most investors would consider not to be in their collective economic interest. *Feldbaum v. McCrory Corp.*, Civ. A. Nos. 11866, 11920, 12006, 1992 WL 119095, at *6 (Del. Ch. June 2, 2002). Such clauses are "strictly construed" in New York. *Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992).

While the FAC generally avers that Plaintiffs "fully satisfied all procedural prerequisites for filing suit set forth in Section 6.07," Plaintiffs admit that they made a written demand on M&T only on April 27, 2007 (FAC ¶ 94), ten days *after* the original Complaint was filed. Plaintiffs thus have failed to comply with the 60-day pre-suit notice requirement set forth in § 6.07(4). The letter itself nominally requested the Trustee to institute proceedings against SPS and the SPS Affiliates, as required by § 6.07(2). (*See* Pls. Omnibus Opp'n, Ex. D.)[11] However, it simultaneously asserted that as a named defendant in Plaintiffs' already-initiated action, M&T could *not* appropriately pursue such claims. Moreover, the letter failed to offer to indemnify M&T for its costs and expenses in complying with the demand, as necessitated by § 6.07(3).

Despite these obvious failures to comply with § 6.07, Plaintiffs contend that pursuant to Rule 9(c) of the Federal Rules of Civil Procedure, the Court should credit their general averment that they "fully satisfied" all the prerequisites to filing suit. (*See* Pls. Omnibus Opp'n 15-16.) But while Rule 9(c) allows parties, in pleading conditions precedent to bringing suit, to "allege generally that all conditions precedent have occurred or been performed," Plaintiffs cannot allege something they know to be untrue, *see* Fed. R. Civ. P. 11(b), and they

---

[11] The Court considers the demand letter in resolving this motion because it is explicitly referenced in the Complaint (FAC ¶ 94) and is integral to its demand allegations. *See Kalin v. Xanboo, Inc.*, No. 04 Civ. 5931 (RJS), 2009 WL 928279, at *8 (S.D.N.Y. Mar. 30, 2009) (considering, for the purpose of a motion to dismiss, a demand letter sent by plaintiff prior to filing a derivative action).

admit that they have not complied with either the sixty-day pre-suit requirement or the indemnification provisions of § 6.07. *See Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.*, No. 09 Civ. 6904 (JFG), 2010 WL 3324705, at *4 (N.D. Ill. Aug. 20, 2010) ("*Sterling II*") (refusing to credit similar general averments of compliance with a no-action clause in light of plaintiffs' contrary admissions); *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted [ ] by statements in the complaint itself . . . ."). Indeed, at oral argument, counsel for Plaintiffs "freely admit[ted] that if read literally the no-action clause would apply here." (Oral Arg. Tr. Oct. 23, 2009 ("Oral Arg."), at 29:1-2.)

Plaintiffs next argue that § 6.07 only applies to suits arising out of an "event of default," and does not cover their contract and tort claims here. (*See* Pls. Omnibus Opp'n 19.) However, by its terms, § 6.07 applies to "*any* proceeding, judicial or otherwise, with respect to this Agreement . . . *or* for the appointment of a receiver or trustee of the Trust, *or* for any other remedy with respect to an event of default hereunder . . . ." (PSA § 6.07 (emphasis added).) This language makes "any other remedy with respect to an event of default" simply one category to which the no-action clause applies, in addition to "*any* proceeding . . . with respect to this Agreement." Consistent with other courts interpreting similar clauses, the Court concludes that the breadth of this provision – applying to "any proceeding, judicial or otherwise, with respect to this Agreement" – requires that the prerequisites for filing suit apply to Plaintiffs' contract *and* tort claims. *See*

*Peak Partners, LP v. Republic Bank*, 191 F. App'x 118, 126-27 (3d Cir. 2006) (holding, under New York law, that a no-action provision containing similar "*with respect to this Indenture*" language barred negligence claims against a servicer); *Feldbaum*, 1992 WL 119095, at *6 (interpreting similar language to bar common law fraud claims).[12]  Therefore, *all* claims on behalf of Plaintiffs' interests in the eighteen uncalled securitizations are governed by the no-action clause.

The same cannot be said for Plaintiffs' claims on behalf of the three called securitizations. No-action clauses do not bar a plaintiff who alleges that it was fraudulently induced to purchase or sell its certificates, as Plaintiffs do here. *See Feldbaum*, 1992 WL 119095, at *8. Moreover, nothing in § 6.07 indicates that the *prerequisites to bringing suit* survive the termination of the trusts or provide standing for the former trustee to litigate claims on behalf of the terminated securitizations. By contrast, the PSA clearly provides that the Trustee's *liability* for misconduct continues post-termination. (*Compare* PSA § 10.13 (describing the Trustee's liability under the PSA and noting that this section "survive[s] the termination of this Agreement") *with* § 6.07 (omitting such a survival statement).) Nor would there be any rationale for enforcing a no-action provision that

---

[12]  Plaintiffs heavily rely on *Metropolitan West Asset Mgmt., LLC v. Mangus Funding, LTD*, No. 03 Civ. 5539 (NRB), 2004 WL 1444868, *5 (S.D.N.Y. June 25, 2004), but that case construed a more narrow no-action provision that only applied to claims relating to a defined "Event of Default," and thus did not preclude plaintiffs from bringing other tort claims. The PSA in this case does not require certificateholders to "give written notice to the Trustee of a continuing Event of Default" prior to initiating any claim, *id.* at *4, or even define that term.  Accordingly, *Metropolitan West* is not applicable to the analysis here.

purported to apply after a clean-up call. Plaintiffs have bought out the interests of any certificateholders who would otherwise need to be protected from the expense of a frivolous suit and there is no longer a Trustee (or even a trust) through whom such a dispute could be channeled. Accordingly, Plaintiffs were only required to make a demand on the Trustee for claims on behalf of the uncalled securitizations.

### 2. Futility of Compliance with § 6.07

Plaintiffs next argue that compliance with § 6.07's demand requirement would have been futile. The Court finds that to be the case with respect to Plaintiffs' claims against M&T, but not SPS and the SPS Affiliates.

#### a. Claims against M&T

The Second Circuit has held that non-compliance with a no-action provision is excused in a suit by bondholders against the indenture trustee. *See Cruden*, 957 F.2d at 968 ("The district court held that the 'no action' clause applied only to debenture holder suits against [the issuer], not the Indenture Trustees. . . . This construction of [the limitation on suits provision] obviously is correct, as it would be absurd to require the debenture holders to ask the Trustee to sue itself."). The same "absurd[ity]" is present here, where Plaintiffs have alleged that M&T "knew" of SPS's predatory servicing and failed to report its breaches of the PSA to the certificateholders. (FAC ¶¶ 80, 102-103.) *See Capital, S.A. v. Lexington Capital Funding III, Ltd.*, No. 10 Civ. 25 (PGG), 2011 WL 3251554, at * 8 (S.D.N.Y. July 28, 2011) (excusing non-compliance with a provision that "would require Plaintiff to demand that the Trustee initiate proceedings against itself to rectify the alleged error."); *Peak Partners,* 191 F.

App'x at 126 n.11 (applying *Cruden* and finding that nexcusing non-compliance with a no-action clause in a suit against the trustee of a securitized pool of mortgage loans "because it would have required [the trustee] . . . in effect, to sue itself."). Accordingly, the no-action provision does not bar suit against M&T.

#### b. Claims against SPS and SPS Affiliates

Plaintiffs contend that compliance with § 6.07 would be similarly futile with respect to their claims against SPS and its Affiliates. Although they concede that "*Cruden* . . . applies only to the trustee" (Oral Arg. at 24:17-18), Plaintiffs nevertheless argue that M&T's misconduct is generally based on its failure to monitor SPS, and that M&T would, in essence, prove the case against itself if it were to sue SPS. But even though demand may be excused where the trustee is plainly conflicted or makes it impossible for certificateholders to comply with a no-action clause, *see, e.g.*, *First Bank Richmond, N.A. v. Credit Suisse First Boston Corp.*, No. 07 Civ. 1262 (LJM), 2008 WL 4410367, at *11 (S.D. Ind. Sept. 24, 2008), Plaintiffs here have not sufficiently pleaded any such circumstances.

First, Plaintiffs appear to suggest that by virtue of its supervisory position, a trustee is *always* subject to a conflict of interest whenever certificateholders allege misconduct on the part of the servicer and name the trustee as a co-defendant for its deficient supervision. However, such a reading would essentially expand the exception recognized by *Cruden* for suits brought against the trustee into one that swallows a no-action clause as a whole. *See In re E.F. Hutton Southwest Props. II, Ltd.*, 953 F.2d 963, 972 (5th Cir. 1992) ("A mere hypothetical possibility that the indenture trustee might favor the interests of the issuer

merely because the former *is* an indenture trustee does not suffice."). Indeed, there is "an important difference between asking the trustee to sue itself – an 'absurd' requirement [the Court] presume[s] the parties did not intend – and asking it to sue a third party, even when the investor alleges wrongdoing by the trustee." *Sterling II*, 2010 WL 3324705, at *6 (reviewing New York law and finding that a no-action provision barred claims by purchasers of mortgage-backed securities against the trustee, but not against the servicer and seller of the loans); *see also Bankers Ins. Co. v. DLJ Mortg. Capital, Inc.*, No. 10 Civ. 419 (EAJ), 2010 WL 4867533, at *4-6 (M.D. Fla. Oct. 8, 2010) (same).

Notably, other provisions of the PSA seek to lessen this potential "conflict of interest" by requiring SPS to indemnify M&T for:

> any and all claims, losses, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that the Trustee . . . may sustain in any way related to the failure of the Servicer to perform its duties and service the Home Equity Loans in compliance with the terms of this Agreement.

(PSA § 8.05(b).) Therefore, by establishing SPS's liability for failing to abide by the PSA, M&T would likely secure a right to indemnification from SPS for any liability it might have to the certificateholders.

Plaintiffs' remaining allegations of a conflict of interest are entirely conclusory. They contend that M&T should have terminated SPS when it learned of its misconduct in the *Curry* and *FTC* settlements, and, instead proceeded to

"engineer[] a release for itself." (FAC ¶¶ 50-51, 124). It is undisputed, however, that M&T was not a party to the *Curry* and *FTC* lawsuits or a signatory to the global release, and was merely included along with all "persons or entities that are or have been investors, owners, trustees or beneficiaries" of the loans at issue in those cases. *See Medina v. Manufacturer's & Traders Trust Co.*, No. 04 Civ. 2175 (JBZ), 2004 WL 3119019, at *1 (N.D. Ill. Dec. 14, 2004).[13] Plaintiffs make no particularized allegations that M&T financially benefitted from its decision not to terminate SPS or otherwise conspired with SPS to defraud the trusts, which are the classic hallmarks of a conflict of interest. *See, e.g.*, *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 73 (2d Cir. 1988) ("Because no evidence was offered in the instant case to suggest that [the trustee] benefitted, directly or indirectly, from its decision to waive the 50-day notice, [it . . .] thus did not engage in a conflict of interest . . . ."); *Velez v. Feinstein*, 451 N.Y.S.2d 110, 115 (App. Div. 1982). Nor do Plaintiffs allege that demand was futile because M&T's actions "made it impossible for Plaintiff[s] to comply" with the no-action clause. *First Bank Richmond, N.A.*, 2008 WL 4410367, at *11 (excusing demand in part because the trustee refused to respond to any of plaintiff's multiple requests for information regarding the other certificateholders); *Sterling Federal Bank, F.S.B. v. Credit Suisse First Boston Corp.*, No. 07 Civ. 2922 (RMD), 2008 WL 4924926, at *11 (N.D. Ill. Nov. 14, 2008) ("*Sterling I*") (same).

Accordingly, the Court concludes that pursuant to § 6.07, Plaintiffs must channel

---

[13] The Court takes judicial notice of this decision, referenced by both parties, which describes the scope of the general release.

13

their grievances against SPS and SPS Affiliates through the Trustee in the first instance. Accordingly, all claims on behalf of the uncalled securitizations against SPS and SPS Affiliates are dismissed.

### D.   Derivative Pleading Requirements

As its final threshold challenge to the Complaint, SPS briefly characterizes all of Plaintiffs' claims as derivative and argues that they have failed to meet federal and state prerequisites to bringing derivative suits. (SPS Mem. 7 n. 11, 24). Specifically, SPS contends that Plaintiffs violated Federal Rule of Civil Procedure 23.1 and New York Business Corporation Law § 626 in failing to (1) file a verified complaint, (2) allege Plaintiffs' contemporaneous ownership of the certificates at the time of Defendants' wrongdoing, and (3) sufficiently allege having made a demand on the trustee or the existence of demand futility. M&T does not move for dismissal on these grounds.

It is well established in the context of shareholder litigation that "where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, *only* the corporation itself, its receiver, . . . or a stockholder suing derivatively in the name of the corporation may maintain an action against the wrongdoer." *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1118 (2d Cir. 1975) (emphasis added). Consequently, an "action must be asserted derivatively if the alleged injury 'was suffered by the corporation and thus by stockholders only through diminution in the value of their shares,' and directly if the injury 'was suffered in some fashion separately and distinctly from injury to the corporation.'" *See Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust*, No. 95 Civ. 9426 (SAS), 1996 WL 601705, at *2

(S.D.N.Y. Oct. 18, 1996) (quoting Deborah A. DeMott, *Shareholder Derivative Actions* § 2.01, at 1 (1994)). Derivative suits may also be brought by the beneficiaries of a trust in New York. *See id.*, at **4-5 (reviewing New York precedent for applying shareholder derivative standards to suits brought by beneficiaries of a trust and finding that "when an alleged injury is not unique to the plaintiff, a suit brought by a beneficiary against the trustees can only be brought derivatively."). "In analyzing whether a claim is derivative, a court 'must look to the nature of the alleged wrong rather than the designation used by plaintiffs.'" *Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905 (RWS), 1996 WL 494904, at **14-15 (S.D.N.Y. Aug. 30, 1996) (quoting *Rabkin v. Philip A. Hunt Chem. Corp.*, 547 A.2d 963, 968 (Del. Ch. 1986)).

The Court has already dismissed all claims on behalf of the *uncalled* securitizations against SPS for failure to comply with § 6.07. Accordingly, the Court need not determine at this stage (1) whether those claims were additionally subject to dismissal because they were stated derivatively or (2) that Rule 23.1, which governs only derivative actions brought "one or more shareholders or members of a corporation or an unincorporated association," applies to certificateholders' claims against the trustee and servicer of a securitization trust. As for Plaintiffs' claims with respect to the three *called* securitizations, such claims plainly seek relief for Plaintiffs' own unique injuries – chief among them a payment of $37 million to SPS for trapped servicing advances. Accordingly, these claims are direct and derivative pleading standards do not apply. Therefore, SPS's motion to dismiss the complaint for failure to comply with derivative pleading standards is denied.

14

* * *

Having thus dismissed all claims against SPS and the SPS Affiliates (1) arising from conduct prior to Plaintiffs' acquisition of their certificates for lack of standing, or (2) made on behalf Plaintiffs' interests in the eighteen uncalled securitizations for failure to comply with § 6.07, the Court proceeds to analyze the sufficiency of the remaining claims.

E.   Sufficiency of Remaining Claims

1. Breach of PSA by M&T

Plaintiffs bring a claim against M&T for breach of the PSA.  Under New York law, there are four elements to a breach of contract claim: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  To plead these elements "a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001) (dismissing breach of contract claim because plaintiffs failed to identify the contractual provisions that defendant breached).  Moreover, "[s]tating in a conclusory manner that an agreement was breached does not sustain a claim of breach of contract." *Berman v. Sugo L.L.C.*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (citing *Posner v. Minn. Mining & Mfg. Co.*, 713 F. Supp. 562, 563-64 (E.D.N.Y. 1989)).  In determining a party's obligations under a contract, "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citation omitted).

Plaintiffs allege that M&T breached the PSA by failing to (1) "monitor the performance of the Servicer," (2) "safeguard the assets of the Securitizations," and (3) "promptly notify the Owners of any breaches of the PSA by the Servicer." (FAC ¶¶ 101-104.)  Although this cause of action does not identify which provisions of the PSA imposed "monitor[ing]" and "safeguard[ing]" duties on M&T, it grounds M&T's notification duties in § 8.20(m).  For the reasons that follow, the Court concludes that only the third "notification" claim is sufficiently stated to survive dismissal.

As an initial matter, the PSA does not require the Trustee to undertake any generalized monitoring or safeguarding duties beyond those explicitly provided in the PSA.  (*See* PSA § 10.01(a) ("The Trustee . . . undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Trustee").)  Indeed, far from imposing a proactive duty on M&T to investigate the information conveyed to it by SPS, the PSA explicitly states that "the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document, but the Trustee in its discretion may make such further inquiry or investigation into such facts or matters as it may see fit." (PSA § 10.03(f)).

The breach of contract claim itself is silent on the contractual source of any "safeguarding" or "monitoring" duties, but in a section titled "The Trustee's Duties Under the PSA," the Complaint references § 6.03 of the PSA.  (*See* FAC ¶¶ 21-23.) That provision states that the Trustee (1)

15

"will hold the Trust Estate in trust for the benefit of the Owners" (PSA § 6.03(a)), and (2) "shall have the power to enforce, and shall enforce the obligations and rights of the other parties to this Agreement . . . ." (*id.* § 6.03(b)).  However, to the extent these general provisions conferred any affirmative monitoring and safeguarding duties on M&T, they are subject to a right of indemnification.  (*See id.* § 6.03(b) ("[N]othing in this Section shall require any action by the Trustee unless the Trustee . . . shall first (i) have been furnished indemnity satisfactory to it . . . .").)  Plaintiffs do not allege to have provided indemnity to the Trustee, rendering unavailing any claim based on § 6.03.

Plaintiffs appear to change course in their briefing, arguing that "the duty to monitor [SPS] does *not* spring from the language in § 6.03 of the PSA quoted by M&T," but rather from M&T's status "as trustee under applicable law."  (Pls. M&T Opp'n 7 (emphasis added).)  But the "applicable law" cited by Plaintiffs concerns fiduciary duties present in ordinary testamentary trusts, *see, e.g.*, *In re Couch Trust*, 723 A.2d 376 (Del. Ch. 1998), which, as explained below in Part E.2, are not applicable with respect to the securitizations governed by PSAs here.  Accordingly, in the absence of any contractual provisions conferring a specific obligation to "monitor" and "safeguard" trust assets, these contractual claims must be dismissed.[14]

Nevertheless, Plaintiffs plausibly allege the existence of M&T's duty to notify certificateholders of SPS's various breaches of the PSA pursuant to § 8.20(m).  According to that provision, the "Trustee shall give notice to the Owners . . . of the occurrence of any event described in [§ 8.20(a) or (b)] . . . of which the Trustee is aware."  (PSA § 8.20(m).) The qualifying events in § 8.20(a) include the Servicer's failure to cure any breach of its representations and warranties (*id.* § 8.20(a)(iv)), such as the representation that its collection practices "have been, in all material respects, legal, proper, prudent and customary in the mortgage servicing business and in conformity with relevant Fannie[]Mae guidelines (*id.* § 3.02(j))."  M&T does not dispute that Plaintiffs have plausibly alleged SPS's breach of its servicing standards (*see, e.g.*, FAC ¶¶ 43-56), and SPS has not moved to dismiss the breach of contract claim stated against it.  Instead, M&T asserts that Plaintiffs (1) do not have standing to bring claims for M&T's misconduct prior to their acquisition of the residual certificates, and (2) have not alleged that M&T was "aware" of any of SPS's breaches thereafter.  (M&T Mem. 12-13, 16.)   As explained above, however, Plaintiffs need not show their own injury to bring claims against M&T that they assumed upon transfer of Conti's certificates.  *See supra* Part III.B.1 (citing N.Y. G.O.L § 13-107).  In any event, taking all well-pleaded allegations contained in the Complaint as true, and drawing all reasonable inferences in favor of Plaintiffs, the Complaint sufficiently alleges that M&T was "aware" of SPS's breaches even after Plaintiffs

---

[14] The Complaint briefly notes that M&T squandered an opportunity to "protect the Securitizations" by not removing SPS as servicer when certain loss liquidation levels were exceeded.  (FAC ¶ 71.)  However, as Plaintiffs acknowledge, the PSA merely "permitted" M&T to remove SPS under those circumstances – with the consent of the Certificate Insurer and the request of a majority of certain classes of certificateholders – and Plaintiffs do not allege that M&T breached any non-discretionary

duty.  (*See* PSA § 8.20 (a)(i)-(vi) (describing when the Trustee "may remove" the Servicer).)

purchased their certificates.[15]  For instance, Plaintiffs describe in considerable detail the legitimate collection practices that SPS was forced to abandon as a result of the *Curry* and *FTC* settlements.  (*See* FAC ¶¶ 45-48.) Plaintiffs further allege that M&T knew about the SPS's servicing defaults, both as a result of the settlements and due to Moody's public downgrade of SPS's servicer rating as "below average," and that M&T breached its duty to report these conditions to the certificateholders pursuant to PSA § 8.20. (*Id.* ¶¶ 53-56, 80.)  These factual allegations allow for the reasonable inference, at this stage, that Plaintiffs are entitled to relief on their breach of contract claim.  Accordingly, the Court finds that Plaintiffs have sufficiently alleged a breach of contract claim premised on M&T's failure to promptly notify certificateholders of SPS's breaches of the PSA.

### 2. Breach of Fiduciary Duty

Plaintiffs next allege that M&T and SPS owed and breached various fiduciary duties

to the certificateholders, and that the SPS Affiliates aided and abetted these breaches. (FAC ¶¶ 112-116, 123-125).  For the reasons that follow, these claims are dismissed.

#### a.   M&T

The Complaint asserts that, as Trustee, M&T had fiduciary responsibilities over trust assets and breached these duties by (1) failing to monitor and supervise SPS, (2) failing to prevent the depletion of the trust assets caused by SPS's deficient conduct, and (3) engaging in self-dealing by "engineer[ing] a release for itself" in the *Curry* and *FTC* settlements.  (FAC ¶ 124.)

To state a claim for a breach of fiduciary duties under New York law, a plaintiff must establish: "(1) a fiduciary duty existing between the parties; (2) the defendant's breach of that duty; and (3) damages suffered by the plaintiff which were proximately caused by the breach." *Metropolitan West*, 2004 WL 1444868, at *8 (citing *Weiss, Peck & Greer, LLC v. Robinson*, No. 03 Civ. 0209, 2003 WL 1396436, at *7 (S.D.N.Y. Mar. 19, 2003). While acknowledging the amorphous nature of a fiduciary relationship, New York courts have generally described it as one in which a party "reposes confidence in another and reasonably relies on the other's superior expertise or knowledge."  *See Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 550 (S.D.N.Y. 2007) (citing *WIT Holding Corp. v. Klein*, 724 N.Y.S.2d 66, 68 (App. Div. 2001) (internal citation omitted)); *accord Penato v. George*, 383 N.Y.S.2d 900, 904 (App. Div. 1976).

An ordinary trustee generally owes a fiduciary duty to act with undivided loyalty and administer the trust solely in the interests of the beneficiaries.  *See In re*

---

[15]  Plaintiffs also argue that M&T had a duty to *become* aware of SPS's misconduct.  To that end, Plaintiffs cite *LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7867 (HB), 2003 WL 22047891, at *6 (S.D.N.Y. Aug. 29, 2003), which held that a trustee's obligations upon "discovery" of certain facts under a PSA were also triggered when the trustee *should have* discovered those facts.  *See also Morgan Guaranty Trust Co. of New York v. Bay View Franchise Mortg. Acceptance Co.*, No. 00 Civ. 8613 (SAS), 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002) ("[a] party 'discovers' a breach when it knows or should know that the breach has occurred.").  In light of the Court's conclusion that the notification claim survives dismissal, it is unnecessary to reach this issue.  The Court simply notes that unlike the pooling and servicing agreements in the cases cited by Plaintiffs, the notification provisions in § 8.20(m) are not predicated on the "discovery" of a servicer's breaches and § 10.03(f) appears to explicitly disclaim any such mandatory investigative duty.

*Heller*, 6 N.Y.3d 649, 655 (2006) (citing Restatement (Second) of Trusts § 170(1)). As explained above, however, much of the common law of trusts, and its corresponding fiduciary obligations, are not applicable to commercial trusts. Rather, the duties of an indenture trustee are generally "strictly defined and limited to the terms of the indenture." *Elliott Assocs.*, 838 F.2d at 71 (citations omitted); *AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 11 N.Y.3d 146, 156 (2008) ("The trustee under a corporate indenture . . . has his [or her] rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement." (citations omitted)); *accord Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985) (citation omitted).

In New York, an indenture trustee owes to bondholders limited extra-contractual duties that expand after the occurrence of an event of default. Prior to an event of default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: a trustee must (1) avoid conflicts of interest, and (2) perform all basic, non-discretionary, ministerial tasks with due care. *See Elliott Assocs.*, 838 F.2d at 71; *LNC Invs., Inc. v. First Fidelity Bank, Nat'l Ass'n,* 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996). These two pre-default obligations are not construed as "*fiduciary* duties," but as obligations whose breach may subject the trustee to "tort liability." *AG Capital Funding Partners, L.P.*, 11 N.Y.3d at 157 (emphasis in original). Following an event of default, however, an indenture trustee's duties to noteholders "come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture." *Beck v. Mfrs. Hanover Trust Co.*, 632 N.Y.S.2d 520, 527 (App. Div. 1995); *see also BNP Paribas*

*Mortg. Corp. v. Bank of America, N.A.*, 778 F. Supp. 2d 375, 401 (S.D.N.Y. 2011).

Consistent with other courts that have addressed this issue, the Court here finds that these constraints apply with similar force to securitization trustees subject to PSAs, which are "trust agreements similar to bond indentures in many respects." *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Financial Corp.*, 603 F.3d 23, 29 (2d Cir. 2010); *see Bank of N.Y. Mellon v. Walnut Place LLC*, No. 11 Civ. 5988 (WHP), 2011 WL 4953907, at *9 & n.6 (S.D.N.Y. Oct. 19, 2011) (observing that a securitization trustee governed by a PSA is subject to narrow pre-default obligations to avoid conflicts of interest and perform basic non-discretionary ministerial tasks); *accord Sterling I*, 2008 WL 4924926, at *15; *First Bank Richmond, N.A.*, 2008 WL 4410367, at *15. Upon careful consideration of the language of the PSA and the nature of the parties' relationship, the Court finds that M&T did not assume any broader fiduciary obligations. Nothing in the PSA states that the Trustee is subject to the fiduciary duties imposed on ordinary trustees. Rather, as noted above, the PSA expressly limits the trustee's duties to those enumerated within the agreement. (*See* PSA § 10.01(a); § 10.03(i) ("Except as otherwise provided in Section 10.01 hereof . . . the right of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty, and the Trustee shall not be answerable for other than its negligence or willful misconduct in the performance of such act").)

Plaintiffs' attempt to fashion a fiduciary duty from the PSA's terms is unpersuasive. (*See* Pls. M&T Opp'n 12-16.) For instance, while § 6.03 provides that the Trustee "will hold the Trust Estate in trust for the benefit

18

of the Owners" and "shall have the power to enforce, and shall enforce the obligations and rights of the other parties to this Agreement," any obligations derived from this Section – as opposed to M&T's other, enumerated duties – are subject to a right of indemnification that has not been satisfied. (*See* § 6.03(b) ("[N]othing in this Section shall require any action by the Trustee unless the Trustee shall first . . . have been furnished indemnity satisfactory to it . . . ."); § 10.03(g) ("The Trustee shall be under no obligation to institute any suit, or to take any remedial proceeding under this Agreement, or to take any steps . . . in the enforcement of any rights and powers hereunder until it shall be indemnified to its satisfaction against any and all costs and expenses . . . and against all liability, except liability which is adjudicated to have resulted from its negligence or willful misconduct, in connection with any action so taken.").)

Although Plaintiffs place much emphasis on the PSA's sole reference to M&T's "fiduciary duties" in § 6.03(c), that section simply exculpates the Trustee from the requirement that it execute certain instruments *if* such instruments "conflict with [the PSA] or with the Trustee's fiduciary duties, or adversely affect its rights and immunities hereunder." It does not confer any specific fiduciary duties and is in no way inconsistent with the requirement that an event of default must occur for such duties to generate. And contrary to Plaintiffs' argument, the fact that M&T maintained some "control" and "responsibility" over the mortgage pool is true of all securitization trustees and does not establish a fiduciary duty in this context. *See Sterling I*, 2008 WL 4924926, at *15; (rejecting the argument that the trustee owed historic common law fiduciary duties to certificateholders by being "placed in a position of trust in which it was required to

manage the securities for the benefit of the certificateholders"); *First Bank Richmond N.A.*, 2008 WL 4410367, at *15 (dismissing, under New York law, fiduciary duty allegations, premised on the analogous claim that the securitization trustee "was in a position to prevent financial injury to the certificateholders"). Accordingly, because no event of default has been alleged, M&T's sole extra-contractual obligations were to avoid conflicts of interest and perform its ministerial functions with due care.

Neither of these obligations is plausibly alleged to have been breached here. M&T's broadly-stated failures to monitor SPS and safeguard trust assets (FAC ¶ 124) plainly do not involve the performance of "basic non-discretionary ministerial tasks." *LNC Invs., Inc.*, 935 F. Supp. at 1347. The claim of "self-dealing," which superficially implicates M&T's duty to avoid conflicts of interest, fares little better. As explained above, the Complaint alleges no specific acts of self-dealing other than the fact that M&T, a non-party to the *Curry* and *FTC* settlements, allowed itself to be included among *all* trustees in the global release of those settlements. (*See* FAC ¶ 53.) Plaintiffs weakly suggest that this global release, coupled with M&T's decision not to subsequently terminate SPS, "created the appearance of impropriety" and "did not remove[] any suggestion" of a potential *quid pro quo* arrangement between SPS and M&T. (Pls. M&T Opp'n 20.) It is well established in the post-*Twombly* world, however, that such speculative pleading is no substitute for plausible factual content, and none has been supplied here. The Complaint entirely fails to allege that M&T conspired with SPS or received any benefit from its decision not to terminate SPS. Accordingly, all fiduciary duty claims against M&T are subject to dismissal.

Even if Plaintiffs had adequately alleged the existence and breach of a fiduciary duty, their claims would nonetheless be "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 390 (1987). (*Compare* FAC ¶ 102 (breach of contract claim premised on failure to monitor and safeguard trust assets) *with id.* ¶ 124 (breach of fiduciary duty claim premised on depletion of trust assets).) Under New York law, "a cause of action for breach of fiduciary duty that is merely duplicative of a breach of contract claim cannot stand." *Grund v. Delaware Charter Guarantee & Trust Co.*, 788 F. Supp. 2d 226, 249-250 (S.D.N.Y. 2011) (citing *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 901 N.Y.S.2d 618, 636 (App. Div. 2010)). For this additional reason, the fiduciary duty claims against M&T are dismissed.

### b. SPS and SPS Affiliates

Plaintiffs advance three principal arguments in support of their claim that SPS owed fiduciary duties to the certificateholders. First, they contend that M&T delegated its own fiduciary powers to safeguard the mortgage loans to SPS. (*See* Pls. SPS Opp'n 8-10.) Second, Plaintiffs allege that SPS owed a fiduciary duty "because of its position of control and responsibility over the servicing and maintenance" of the mortgage loans. (FAC ¶ 113.) Lastly, Plaintiffs point to PSA § 8.01, which instructs SPS to service the loans "in accordance with . . . the servicing standards set forth in the Fannie[] Mae Guide . . [and to] have all of the servicing obligations hereunder which a lender would have under the Fannie[] Mae Guide." The Fannie Mae Guide, in turn, refers to the

"fiduciary" status of servicers who contract with Fannie Mae, which allegedly applies to SPS by reference. (*See* Pls. SPS Opp'n 10-11 (citing Fannie Mae, Servicing Guide §202.01 (2006) ("Since these funds and assets are owned by Fannie Mae and other parties . . . , the servicer in its handling of these funds is acting on behalf of, and as a fiduciary for, Fannie Mae and other parties, as their respective interests may appear – and not as a debtor of Fannie Mae.")); FAC ¶ 26 ("The Fannie Mae Guidelines also make clear that the Servicer is a fiduciary").) The Court finds these arguments unpersuasive.

Plaintiffs' "delegation" argument is unavailing because the Court has already held that M&T was not subject to common law fiduciary obligations, and thus could not delegate such duties to SPS. As for Plaintiffs' allegations regarding SPS's "control and responsibility" over trust assets, New York law is clear that a "conventional business relationship, without more, does not become a fiduciary relationship by mere allegation." *Friedman v. Anderson*, 803 N.Y.S.2d 514, 516 (App. Div. 2005) (citing *Oursler v. Women's Interart Ctr., Inc.*, 566 N.Y.S.2d 295, 297 (App. Div. 1991). Thus, "parties dealing at arms length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation, absent extraordinary circumstances." *Henneberry*, 532 F. Supp. 2d at 550 (citing *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 679 (S.D.N.Y. 1991)); *accord Credit Suisse First Boston Mortgage Capital LLC v. Cohn*, No. 03 Civ. 6146 (DC), 2004 WL 1871525, at *5 (S.D.N.Y. Aug. 19, 2004) (internal citations omitted).

No such extraordinary circumstances are present in this case, which involves claims

by sophisticated hedge funds against a mortgage servicer subject to a pooling and servicing agreement.  There is no allegation that Plaintiffs had a long-standing relationship with SPS prior to acquiring the certificates, and the commercial relationship that followed Plaintiffs' acquisitions sprang entirely from the PSA and related agreements.  Thus, the fact that SPS "took on itself certain contractual responsibilities to service and account for mortgage loan pools, does not mean that there was the sort of special relation of 'great intimacy, confidentiality, reliance and superiority of influence,' . . . of the sort required for a fiduciary relationship."  *Orix Real Estate Capital Mkts., LLC v. Superior Bank, FSB*, 127 F. Supp. 2d 981, 985 (N.D. Ill. 2000) (quoting *United States v. Reed*, 601 F. Supp. 685, 704 (S.D.N.Y. 1985) *rev'd in part on other grounds*, 773 F.2d 477 (2d Cir. 1985)).

Indeed, several courts in this district have dismissed certificateholders' breach of fiduciary duty claims against mortgage servicers under analogous circumstances.  *See Teachers Ins. and Annuity Ass'n of Am. v. CRIIMI MAE Servs. Ltd. P'ship*, No. 06 Civ. 0392 (LAK), 2007 WL 7569162, at *1 (S.D.N.Y. Sept. 7, 2007) (dismissing certificateholders' fiduciary claims against a special servicer upon determining that nothing in the PSA indicated that the servicer was intended to be considered a fiduciary of the plaintiffs or the trust in which they invested); *Physicians Mut. Ins. Co. v. Greystone Servicing Corp., Inc.*, No. 07 Civ. 10490 (NRB), 2009 WL 855648, at *10 (S.D.N.Y. Mar. 25, 2009) ("GSC's role as servicer and holder of the mortgage notes did not create fiduciary duties . . . and plaintiffs' allegation that they 'reposed complete confidence and trust in GSC to collect and properly remit payments . . . in accordance with the Servicing Agreements' . . . does not lead us to conclude otherwise.");

*cf. Argonaut P'ship L.P. v. Bankers Tr. Co. Ltd.*, 96 Civ. 1970 (LLS), 2001 WL 585519, 3 (S.D.N.Y. May 30, 2001) ("The complaints and the Servicing Agreement show no more than a conventional business relationship, in which the Servicer collected and transmitted funds on behalf of BT and Bancomer, exercising 'that degree of skill and care which is consistent with the same degree of skill and care that independent loan servicing companies in the United States exercise with respect to similar receivables owned or serviced by such servicing companies . . . .'").  Likewise here, in the absence of extraordinary circumstances, SPS's status as a servicer does not confer fiduciary duties beyond its contractual obligations.

Plaintiffs' conclusory allegations that "[i]t is generally and widely known in the collateralized debt obligation industry that servicers owe fiduciary duties to the owners" (FAC ¶ 15) and that "[t]he owners repose their confidence and trust in the servicer" (*id.* ¶ 16) are insufficient to plead a fiduciary duty as a matter of law.  *See Abercrombie v. Andrew College*, 438 F. Supp. 2d 243, 275 (S.D.N.Y. 2006) ("[C]ourts routinely have held that conclusory allegations of a 'special relationship,' and 'complete trust and confidence' are insufficient to state a claim of a fiduciary duty." (internal quotations and citations omitted)); *Rosenblatt v. Christie, Manson & Woods Ltd.*, No. 04 Civ. 4205 (PKC), 2005 WL 2649027, at *10 (S.D.N.Y. Oct. 14, 2005).  And the few cases from which Plaintiffs purport to establish such fiduciary duties do not lead to a different conclusion.  (*See* Pls. SPS Opp'n 10 (citing *Rispler v. Sol Spitz Co., Inc.*, No. 04 Civ. 1323 (DLT) (ARL), 2007 WL 1926531, at *5 (E.D.N.Y. June 6, 2007); *Teachers Ins. & Annuity Ass'n v. CRIIMI MAE Servs. L.P.*, No. 06 Civ. 0392 (KNF), 2007 U.S. Dist.

LEXIS 28279 (S.D.N.Y. Mar. 20, 2007) (Report and Recommendation)); *Omni Berkshire Corp.* v. *Wells Fargo Bank, NA.*, 307 F. Supp. 2d 534, 539 (S.D.N.Y. 2004)).) In *Rispler*, the court analyzed the existence of a *statutory* fiduciary duty in an ERISA action, a context where "Congress intended ERISA's definition of fiduciary to be broadly construed." 2007 WL 1926531, at *5 (citing *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997)). The then-pending Report & Recommendation cited by Plaintiffs in *Teachers* was not adopted by the district court, which found instead that the PSA did *not* impose fiduciary duties on the servicer. *See Teachers,* 2007 WL 7569162, at *1. Finally, the brief reference in *Omni Berkshire* to a specific hotel loan servicer's "fiduciary obligation" to insist that borrowers purchase insurance coverage against terrorist attacks is inapplicable to the case at hand.

Finally, the PSA's reference to the Fannie Mae Guide does not establish any extra-contractual fiduciary duties on behalf of SPS. Plaintiffs cite no authority to support their claim that the PSA's incorporation of various *servicing standards* in the Fannie Mae Guide also establishes, by reference, the same purportedly *fiduciary relationship* that may arise from the separate contracts into which Fannie Mae enters with servicers.[16] SPS did not enter into any

relevant contract with Fannie Mae. And as at least one court has observed, the Fannie Mae guide is "at most a supplement to the service contract," and "of course, is not a contract." *Hinton v. Fed. Nat'l Mortg. Ass'n*, 945 F. Supp. 1052, 1058 (S.D. Tex. 1996). Here, the operative contract is the PSA, a complex 158-page agreement negotiated by sophisticated entities, whose provisions do not establish a fiduciary relationship between the certificateholders and SPS.

In any event, even if Plaintiffs had stated a fiduciary duty claim against SPS, it would be entirely duplicative of their pending breach of contract claim and subject to dismissal. "In New York, '[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand.'" *Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, No. 07 Civ. 376 (JMB), 2008 WL 2275902, at *3 (S.D.N.Y. June 3, 2008) (citing *William Kaufman Org., Ltd. v. Graham & James LLP,* 703 N.Y.S.2d 439, 442 (App. Div. 2000)). Instead, a plaintiff must "set[] forth allegations that, *apart from the terms of the contract*, the parties created a relationship of higher trust than would arise from [their contracts] alone so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties." *Brooks v. Key Trust Co. Nat. Ass'n*, 809 N.Y.S.2d 270, 272-273 (App. Div. 2006) (alterations in original (citations omitted)). Here, the claim that "SPS's self-dealing and concealment breached its fiduciary duties" (FAC ¶ 114) simply restates, in nearly

---

[16] Indeed, if the Fannie Mae Guide's brief reference to a servicer's fiduciary status could be so incorporated here, then so would its admonition that "[t]he Lenders service Fannie Mae loans as independent contractors" (Fannie Mae Servicing Guide, Part I, § 202 (2006)) – language that has been found to preclude the existence of a fiduciary duty in servicers. *See Teachers*, 2007 WL 7569162, at *1 (finding that no fiduciary relationship existed between certificateholders and a servicer where the PSA directed that "the Servicer and the Special Servicer, *each as an independent contractor* servicer, shall service and administer the Mortgage Loans on

behalf of the Trust Fund solely in the best interests of and for the benefit of all of the Certificateholders." (citations omitted)); *Physicians Mut. Ins. Co.*, 2009 WL 855648, at *5 (finding that where a servicer undertook an obligation to act as an "independent contractor and not as agent" for the plaintiffs, it owed no extra-contractual duties).

identical words, the breach of contract claim premised on SPS's "engag[ing] in illicit self-dealing in order to boost its profits" (*id.* ¶¶ 98-99). Because any fiduciary duty here would be "derived directly and exclusively from [SPS's] contractual relationship with [P]laintiffs," their claims are redundant under New York law. *Physicians Mut. Ins. Co.*, 2009 WL 855648, at *10; *see also Atlantis Info. Tech., GmbH v. CA, Inc.*, 485 F. Supp. 2d 224, 232 (E.D.N.Y. 2007).

Accordingly, the breach of fiduciary duty claim against SPS is dismissed. Absent that underlying breach, claims against the SPS Affiliates for aiding and abetting that breach must be dismissed as well. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 303 (2d Cir. 2006).

### 3. Fraud by SPS

"To prove fraud under New York law, 'a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (quoting *Banque Arabe*, 57 F.3d at 153). Claims of fraud must be pleaded with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. Accordingly, the Complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99. The

pleading constraint in Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *Id.* (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

The Complaint's allegations of fraud fall into two general categories, referred to here as (1) the "reporting fraud," and (2) the "clean-up call fraud." The reporting fraud entailed alleged misrepresentations by SPS about the legitimacy of its charges on monthly reports and base liquidation reports it submitted to the Trustee. (FAC ¶ 130.) Plaintiffs claim that these reports contained false charges for "work that either was not performed, was above actual cost, or which was a core function of [SPS] for which [SPS] had already been reimbursed." (*Id.*) According to the Complaint, SPS knew the reports were false and intended for M&T and the certificateholders to rely on them. (*Id.* ¶¶ 131-132.) By contrast, the clean-up call fraud turns on allegations that SPS intentionally misrepresented material facts to induce Plaintiffs to exercise their clean-up call rights. Specifically, the Complaint alleges that SPS intentionally overestimated the amounts of "attainable" deficiency balances on defaulted loans that were, in fact, uncollectible due to SPS's prior neglect of the loans. (FAC ¶¶ 59, 63, 135-139.) In addition, the Complaint alleges that SPS "impliedly represented" that its reimbursable servicing advances were for services rendered in conformance with Fannie Mae guidelines, industry norms, and the PSA. (*Id.* ¶¶ 131, 133.) In purported reliance on this information, Plaintiffs made three clean-up calls, paid SPS in excess of $37 million for illegitimate servicing advances, and ultimately discovered that "virtually nothing" could be collected from the deficiency balances. (*Id.* ¶¶ 63, 134.)

For the reasons that follow, the reporting fraud allegations are dismissed as duplicative of the breach of contract claim against SPS. Although the Court finds that the clean-up call fraud allegations are sufficiently collateral to the PSA, they are likewise dismissed because they fail to plead fraud with the particularity required by Rule 9(b).

Under New York law, a cause of action sounding in fraud cannot be maintained when the only fraud charged relates to a breach of contract. *See W.B. David & Co., Inc. v. DWA Commc'ns, Inc.*, No. 02 Civ. 8479 (BSJ), 2004 WL 369147, at *3 (S.D.N.Y. Feb. 26, 2004) (noting that courts applying New York law do not "recognize claims that are essentially contract claims masquerading as claims of fraud" (citations omitted)); *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996) (dismissing a fraud claim insufficiently distinct from the breach of contract claim, which "merely append[ed] allegations about [defendant's] state of mind to the claim for breach of contract"). Where, as here, a fraud claim is stated in conjunction with a breach of contract claim, a plaintiff must either: (i) "demonstrate a legal duty separate from the duty to perform under the contract"; (ii) "demonstrate a fraudulent misrepresentation collateral or extraneous to the contract"; or (iii) "seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc.*, 98 F.3d at 20 (citations omitted). A fraud claim is redundant if it "arises out of the same facts as a breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties . . . ." *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (quoting *Sudul v. Computer*

*Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994)). However, "a misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty." *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) (quoting *First Bank of the Ams. v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 292, 690 N.Y.S.2d 17, 21 (App. Div. 1999)); *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (1986).

The first and third prongs of the *Bridgestone/Firestone* standard are inapplicable here. The Court has already concluded that SPS did not owe Plaintiffs any independent extra-contractual duties. As for special damages, although Plaintiffs purport to demand "exemplary damages in an amount sufficient to deter such conduct in the future" (FAC ¶ 136), such damages are unavailable as a matter of law. "[U]nder New York law, punitive damages are not available in the ordinary fraud and deceit case; a plaintiff must plead that defendant's conduct was morally culpable." *Trepel v. Abdoulaye*, 185 F. Supp. 2d 308, 311 (S.D.N.Y. 2002). A claim for punitive damages is "available only where [the] defendant acts with evil and reprehensible motives." *China Trust Bank of N.Y. v. Standard Chartered Bank, PLC*, 981 F. Supp. 282, 289 (S.D.N.Y. 1997) (citation omitted). Additionally, where, as here, an action for punitive damages "has its genesis in the contractual relationship between the parties," a plaintiff must show that defendant's conduct "was part of a pattern of behavior aimed at the public generally." *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. 1995) (citing *Rocanova v. Equitable Life Assurance Soc'y.*, 634 N.E.2d 940, 943 (N.Y. 1994). Plaintiffs have

neither averred facts of a sufficiently "evil and reprehensible motive" by SPS in this garden-variety commercial fraud, nor alleged behavior deliberately aimed at the general public.   The claim for punitive damages is thus stricken and cannot support a duplicative fraud claim.

Accordingly, the relevant inquiry here is whether the fraud claims are sufficiently "collateral or extraneous" to breaches of the PSA.   This is plainly not the case with respect to the reporting fraud claim, which implicates the relevant servicing standards (PSA § 8.01), the Servicer's rights to recoup servicing advances (*id.* § 8.09), and the Servicer's obligation to report relevant servicing information in periodic reports to the Trustee (*id.* § 8.08(d)(ii)).   The claim thus merely recasts SPS's alleged violations of these contractual provisions as fraudulent acts and misrepresentations.   Consequently, "[t]he alleged false representations are the essential terms of the . . . contract [and] . . . failure by [SPS] to honor these terms gives rise to an action for breach of contract, not one in tort."   *Rabin v. Money Life Ins. Co.*, 387 F. App'x 36, 40, (2d Cir. 2010) (first and second alterations in original (quoting *Wegman v. Dairylea Coop., Inc.*, 376 N.Y.S.2d 728, 734 (App. Div. 1975))); *see Physicians Mut. Ins. Co.*, 2009 WL 855648, at *4 (dismissing a fraud claim against a servicer as duplicative of a PSA-based claim where the servicer unlawfully redeemed plaintiffs' interests for its own benefit and falsely advised them that such redemptions were caused by legitimate prepayments by mortgagors).   The reporting fraud claims are therefore dismissed.

By contrast, the Court concludes that the clean-up call fraud claims are sufficiently extraneous to the PSA to be stated alongside a breach of contract claim.   Although the relevant misrepresentations came in the

course of the parties' contractual relationship, they were allegedly made in an attempt to induce Plaintiffs' to consummate a separate, optional clean-up call transaction and enter into a new servicing contract with SPS.   Put another way, while the PSA established the *mechanism* for executing the clean-up calls, the fraud claim at issue does not concern a failure to comply with that mechanism, but rather the fraudulent inducement of separate transactions and new contracts.   Accordingly, this fraud claim cannot be dismissed as redundant.

Nevertheless, the allegations pertaining to the clean-up call fraud are impermissibly generalized as to the time, place, speaker and content of the misrepresentations and must be dismissed under Rule 9(b).   As explained above, the purpose of Rule 9(b)'s particularity requirements is to give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests."   *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir. 1979), *cert. denied,* 446 U.S. 946 (1980) (citations omitted).   The pleadings fail to satisfy this requirement in several ways.

First, the Complaint broadly alleges that "[s]tarting in 2005, various officers and employees of SPS provided false, inaccurate and inflated numbers to Plaintiffs with respect to both the Deficiency Balances and the trapped Servicing Advances."   (FAC ¶ 59.)   Clearly, these generalized allegations fail to identify the speakers whose statements might expose SPS to liability. *See Ben Hur Moving & Storage, Inc. v. Better Bus. Bureau,* No. 08 Civ. 6572 (JGK), 2008 WL 4702458, at *4 (S.D.N.Y. Oct. 3, 2008) ("The plaintiff's complaint fails [the Rule 9(b)] standard because the allegations in the complaint do not specify the time, place, [or] speaker . . . of the misrepresentations that were allegedly made

through the mails and over the Internet.");
*Wolff Office Equip. Corp. v. Wang Labs., Inc.*, No. 87 Civ. 1498 (SWK), 1987 WL 26844, at *3 (S.D.N.Y. Nov. 30, 1987) (dismissing complaint under Rule 9(b) because the averments of misrepresentations by the corporate defendant "fail[ed] to connect the allegation of fraudulent misrepresentation to a particular speaker.").

Second, Plaintiffs offer few supporting details establishing the "when and where" of the misrepresentations, other than that they were made in 2005. Moreover, the alleged misrepresentations are "identified in vague and general terms," concerning only the general topics as to which they were related. *Weinstein v. Appelbaum*, 193 F. Supp. 2d 774, 779 (S.D.N.Y. 2002). For instance, Plaintiffs supply no factual detail to support their conclusory allegation that SPS misrepresented the existence of "significant" recoverable deficiency balances, when, in fact, SPS had "failed to preserve, or otherwise bargained away those balances." (FAC ¶¶ 59, 63.)[17] Moreover, to the extent that Plaintiffs appear to point to some specific documents containing misrepresentations, they must identify the documents and the specific statements within them that were false or misleading. *See Hunt v. Enzo Biochem, Inc.* 530 F. Supp. 2d 580, 601 (S.D.N.Y. 2008) ("The conclusory allegations contained in these paragraphs are insufficiently particularized under Rule 9(b) because they do not identify any specific statements made by

[Defendant].").   In the absence of such detail, the fraud claims are dismissed with leave to replead.

### 4. Negligent Misrepresentation

#### a. SPS

The Court also dismisses a negligent misrepresentation claim against SPS (*see* FAC ¶¶ 137-139), which is based on the same factual allegations as the fraud claims (*see id.* ¶¶ 128-136) and suffers from the same pleading deficiencies.   Specifically, any misrepresentations that SPS made *prior to* the clean-up calls, such as those about the "nature and extent of the charges on the base liquidation report and the compliance reports to the Trustee and Certificate Insurer" (FAC ¶ 138), implicate SPS's reporting duties under the PSA and are dismissed as redundant of the breach of contract claim.   And SPS's alleged misrepresentations to Plaintiffs during the clean-up calls – while sufficiently extraneous to the PSA – nevertheless are not pleaded with the particularity required by Rule 9(b).

The language of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."   *Rombach*, 355 F.3d at 171. Although the Second Circuit has expressly left open the question of whether Rule 9(b) applies to claims of negligent misrepresentations, *see Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004), district courts in this Circuit have concluded that the Rule is applicable to negligent misrepresentation claims that are premised on fraudulent conduct.   *See Naughright v. Weiss*, No. 10 Civ. 8451

---

[17] Because the Court dismisses the claim under Rule 9(b), it does not decide at this stage whether SPS's statements concerning "attainable" or "recoverable" unpaid balances on loans following foreclosure constituted expectations about the future or promises of future action, which cannot support a fraud claim, or actionable misrepresentations of present existing fact. *See Dooner v. Keefe, Bruyette & Woods, Inc.*, 157 F. Supp. 2d 265, 278 (S.D.N.Y. 2001).

(RWS), 2011 WL 5835047, at *7 (S.D.N.Y. Nov. 18, 2011) ("[S]ince negligent misrepresentation is a type of fraud, it is subject to Rule 9(b)'s heightened pleading standard." (citation omitted)); *Bettinger v. Doueck*, No. 10 Civ. 7653 (PKC), 2011 WL 2419799, at *5 (S.D.N.Y. June 3, 2011); *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ 318 (RJS), 2009 WL 2242605, at *12 (S.D.N.Y. July 27, 2009); *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4770 (SAS), 2003 WL 1858153, at *4, 8 n.10 (S.D.N.Y.  Apr. 10, 2003).  As with their fraud claim, Plaintiffs offer insufficient supporting details about SPS's communications surrounding the clean-up calls, alleging merely that "[SPS] misrepresented to Plaintiffs the amount that could be realized on the Deficiency Balances" by making "specific assertions that the Deficiency Balances had not been released and were accurately reflected on the reports it provided to Plaintiffs" (FAC ¶ 138).  Because such allegations are too generalized and conclusory to pass muster under Rule 9(b), the negligent misrepresentation claim against SPS is dismissed.

### b. M&T

The negligent misrepresentation claim against M&T arises entirely out of its contractual duties to provide periodic reports to the owners.  Furthermore, Plaintiffs have not alleged any special damages caused by the negligent misrepresentation that are separate and distinct from those claimed for breach of the PSA.  Because the factual predicate of this negligent misrepresentation claim is not extraneous to the PSA, this claim must be dismissed.  *See LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate Inc.*, No. 02 Civ. 7868 (HB), 2003 WL 1461483, at *3 (S.D.N.Y. Mar. 21, 2003); *Maharaja Travel, Inc. v. Bank of India*, No. 94 Civ.

8308 (KTD), 1997 WL 154044, at *4 (S.D.N.Y. Apr. 2, 1997).

### 5. Breach of Duty to Disclose

The FAC also alleges a stand-alone breach of a "duty to disclose" against SPS and M&T.  Under New York law, a duty to disclose material facts arises in one of three ways:  (1) where the parties stand in a confidential fiduciary relationship, (2) where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge, or (3) where a party to a business transaction has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  Although a breach of a duty to disclose can constitute an element of various torts such as fraudulent concealment, negligent misrepresentation based on omission, or breach of fiduciary duty, Plaintiffs have failed to provide Defendants with notice as to which theory they are advancing.  The claim simply states, in conclusory fashion, that SPS and M&T had "superior knowledge" about SPS's "substandard servicing practices," knew that "certificateholders would act on mistaken knowledge regarding the state of the Securitizations and the appearance that Fairbanks/SPS had not breached the PSA," and failed to disclose the relevant facts. (FAC ¶ 111.)

Regardless of whether this claim is styled as a fraudulent concealment or a negligent omission, it is subject to the heightened pleading standards of Rule 9(b). *See Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03 Civ. 3120 (LTS), 2011 WL

4348138, at *3 (S.D.N.Y. Sept. 15, 2011). And as explained above, Plaintiffs simply have not identified any specific statements from M&T and SPS, or explained why these communications were materially incomplete. *See Aetna Cas. and Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 583 (2d Cir. 2005) (affirming the district court's dismissal of a fraudulent omission claim under Rule 9(b) where the plaintiff claimed to have relied on certain communications from defendants but "failed to set forth the precise circumstances in which it received the [documents], and how those circumstances gave rise to a reasonable belief on plaintiff's part that they were comprehensive."). Plaintiffs have not shown how Defendants *knew* that (1) "significant" deficiency balances on the loans . . . were "not attainable" (FAC ¶ 135), and (2) Plaintiffs relied on this misinformation. And in the absence of particularized allegations about what Defendants specifically disclosed and omitted, Plaintiffs fail to demonstrate reasonable reliance on any specific misstatement, which is "essential to a claim of duty to disclose or fraudulent concealment." *Psenicska v. Twentieth Century Fox Film Corp.*, 409 F. App'x 368, 371 (2d Cir. 2009) (summary order); *P.T. Bank Cent. Asia, N.Y. Branch v. ABN AMRO Bank N.V.*, 754 N.Y.S.2d 245, 250 (App. Div. 2003). Accordingly, this claim is dismissed.

### 6. Unjust Enrichment

Plaintiffs assert a claim for unjust enrichment solely against the SPS Affiliates, contending that they were enriched through money received "from the Securitizations based on non-existent, excessive, or bogus services." (FAC ¶ 118.)

To prevail on a claim for unjust enrichment in New York, a plaintiff must establish "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001). Unjust enrichment is a quasi-contractual claim that "ordinarily can be maintained only in the absence of a valid, enforceable contract." *Ohio Players, Inc. v. Polygram Records, Inc.*, No. 99 Civ. 33, 2000 WL 1616999, at *4 (S.D.N.Y. Oct. 27, 2000); *accord Clark-Fitzpatrick*, 70 N.Y.2d 382, 389 ("It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties."). "That principle applies even where 'the party seeking to dismiss the claim is not a party to the contract.'" *Teachers Ins. & Annuity Ass'n of Am. v. CRIIMI MAE Servs. Ltd. P'ship*, 681 F. Supp. 2d 501, 511 (S.D.N.Y. 2010) (citing *Micro Bio-Medics, Inc. v. Westchester Med. Ctr.*, 800 N.Y.S.2d 350 (Sup. Ct. 2004)). Although New York law on this issue is not entirely settled, in the last two decades, "decisions both in New York state courts and in this district have consistently held that claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract." *Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800 (LMM), 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007) (collecting cases); *Bellino Schwartz Padob Adver. v. Solaris Mktg. Grp.*, 635 N.Y.S.2d 587, 588 (App. Div. 1995) ("The existence of an express contract

28

between Solaris and plaintiff governing the subject matter of the plaintiff's claim also bars any quasi-contractual claims against defendant Titan, as a third party nonsignatory to the valid and enforceable contract between those parties."); *Feigen v. Advance Capital Mgmt. Corp.*, 541 N.Y.S.2d 797, 799 (App. Div. 1989) ("[A] non-signatory to a contract cannot be held liable where there is an express contract covering the same subject matter.").

In *Teachers*, certificateholders in two REMIC trusts governed by a PSA sued the servicer for improperly modifying and selling a loan in violation of the PSA. *Teachers*, 681 F. Supp. 2d at 510-12. The certificateholders also brought an unjust enrichment claim against the servicer's parent company, which, as a result of holding other classes of certificates in the securitizations, earned proceeds from the illegal sale by the servicer. *Id.* at 511-12. The court dismissed the unjust enrichment claim, finding it "immaterial" that the PSA did not provide Plaintiffs with an explicit right of action against the non-signatory parent company. *Id.* at 512. The subject matter of the unjust enrichment claim, reasoned the court, was plainly governed by the PSA, which defined the servicer's duty to "service loans for the benefit of all certificate holders." *Id.*

The Court sees no reason to reach a different conclusion under analogous circumstances here. Although the SPS Affiliates were not parties to the PSA, they were allegedly enriched as a result of SPS's noncompliance with the PSA's servicing standards. This claim thus falls squarely within the subject matter of the PSA. (*See* FAC ¶ 78 ("The Fannie Mae Guidelines only allowed reimbursement for payments made to third parties, and only for limited, legitimate expenses. The payments listed

above [to the SPS Affiliates] were not to third parties and were for bogus charges, and that is why Fairbanks/SPS went to elaborate lengths to disguise the true nature of the entities it owned and controlled and to which it directed that payments be made.").) Therefore, the unjust enrichment claims merit dismissal. *See Vitale v. Steinberg*, 764 N.Y.S.2d 236, 239 (App. Div. 2003) ("[T]he existence of . . . an express contract governing the subject matter of plaintiff's claims, also bars the unjust enrichment cause of action as against the individual defendants, notwithstanding the fact that they were not signatories to that agreement.").

Plaintiffs nevertheless argue that dismissal would be premature because Rule 8(d) permits a party to "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). While alternative quasi-contract claims may survive dismissal under Rule 8(d) where there is a dispute as to the validity of a governing contract, *see Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009), "the existence of a valid and binding contract governing the subject matter at issue in a particular case *does* act to preclude a claim for unjust enrichment even against a third party non-signatory to the agreement." *Network Enters., Inc. v. Reality Racing, Inc.*, No. 09 Civ. 4664 (RJS), 2010 WL 3529237, at *7 (S.D.N.Y. Aug. 24, 2010) (quoting *Law Debenture v. Maverick Tube Corp.*, No. 06 Civ. 14320 (RJS), 2008 WL 4615896, at *12 (S.D.N.Y. Oct. 15, 2008) (collecting cases)). Here, it is undisputed that the PSA is a valid and enforceable contract. Accordingly, the unjust enrichment claims are dismissed. *See Air Atlanta*, 637 F. Supp. 2d at 196 ("[Plaintiff's] failure to allege that the contracts at issue are invalid or

unenforceable precludes it . . . from seeking quasi-contractual recovery for events arising out of the same subject matter.").

### 7. Negligence

The negligence claim against all Defendants does not allege the violation of any legal duty independent of the PSA.[18] "Merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim." *Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 390. Accordingly, like Plaintiffs' other quasi-contractual claims, these claims are dismissed.

### 8. Conversion

The Complaint charges SPS and the SPS Affiliates with conversion for obtaining "dominion and control over funds through improper means," including payment for fictitious or overpriced services. (FAC ¶ 147.) Under New York law, to plead a claim of conversion, a plaintiff must establish that "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Noses v. Martin*, 360 F. Supp. 2d 533, 541

(S.D.N.Y. 2004) (internal citation and quotation marks omitted). A conversion claim may only succeed, however, if a plaintiff alleges wrongs and damages distinct from those predicated on a breach of contract. *See Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 199 (S.D.N.Y. 2006); *Priolo Commc'ns, Inc. v. MCI Telecomms. Corp.*, 669 N.Y.S.2d 376, 377 (App. Div. 1998) ("The plaintiff's claim alleging conversion merely restates its cause of action to recover damages for breach of contract and does not allege a separate taking. A claim to recover damages for conversion cannot be predicated on a mere breach of contract."); *accord Alliance Group Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 170 (D. Conn. 2005); *Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 124 (S.D.N.Y. 1996). Thus, "[i]n determining whether a conversion claim is duplicative of a breach of contract claim, courts look both to the material facts upon which each claim is based and to the alleged injuries for which damages are sought." *Physicians Mut. Ins. Co.*, 2009 WL 855648, at *10 (quoting *AD Rendon Commc'ns, Inc. v. Lumina Ams., Inc.*, No. 04 Civ. 8832 (KMK), 2007 WL 2962591, at *5 (S.D.N.Y. Oct. 10, 2007)).

Here, the same facts make up the breach of contract and conversion claims. Both allege that SPS violated certain duties and obligations specifically enumerated by the PSA when it serviced the mortgages and sought reimbursement for servicing advances. (*See, e.g.*, FAC ¶ 98 ("[SPS] failed to service the Subject Loans to the standards to which it was contractually obligated. Further, [SPS] was only entitled to recoup legitimate advances to true third party vendors. Instead of doing so, [SPS] engaged in illicit self-dealing in order to boost its profits at the expense of the Securitizations, and thereby at the expense

---

[18] Although the claim's heading states that it is alleged against all Defendants, the text below does not mention the SPS Affiliates. Even if it had done so, Plaintiffs fail to indicate the source of any duty of care by the SPS Affiliates to them. Moreover, this claim arises out of conduct that plainly falls within the subject matter of the PSA and is redundant. *See Clarendon Nat. Ins. Co. v. Health Plan Adm'rs*, No. 08 Civ. 6279 (GBD). 2009 WL 3053736, at *4 (S.D.N.Y. Sept. 24, 2009).

of Owners."). Moreover, Plaintiffs have not established any conversion damages distinct from the breach of contract claim against SPS. Accordingly, "if Plaintiff[s] were to recover under both claims, [they] would in effect be paid twice." *AD Rendon Commc'ns, Inc.*, 2007 WL 2962591, at *5; *see also Physicians Mut. Ins. Co.*, 2009 WL 855648, at **2-3, 10 (dismissing conversion claims predicated on a servicer's scheme to obtain plaintiffs' interests in the actual mortgage loans for itself). Accordingly, the conversion claim against SPS is dismissed.

For the reasons stated above, the same result obtains with respect to conversion claims against the SPS Affiliates, even though they were not signatories to the PSA. To the extent that the SPS Affiliates were in a position to exercise "unauthorized dominion" over any specifically identifiable property of the Plaintiffs, they were placed there by SPS in violation of the PSA.[19] *See id.*, at *10 (dismissing conversion claims against non-signatories to a PSA where, as here, "the same facts that provide the basis for plaintiffs' contract breach claim make up their conversion claim, and plaintiffs seek the same relief for both claims."). Accordingly, the conversion claims against all Defendants are dismissed.

### 9. Money Had and Received

The Court also dismisses as duplicative the equitable claim of "money had and received" against SPS and the SPS Affiliates. "The essential elements of a claim for money had and received are that (1) defendant received money belonging to plaintiff; (2) defendant benefited from the

receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Nordlicht v. N.Y. Tel. Co.*, 799 F.2d 859, 865 (2d Cir. 1986) (internal quotations omitted). However, an action for "money had and received" does not lie where there is a valid contract between the parties respecting the matter at issue. *See Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998) (affirming district court's dismissal of money had and received claim, and citing *Clark-Fitzpatrick, Inc.*, 516 N.E.2d at 193). Plaintiffs' threshold entitlement to any funds obtained by SPS and SPS Affiliates is premised entirely on their residual rights under the PSA. As such, these claims are dismissed along with Plaintiffs' other quasi-contract claims. *See One Step Up, Ltd. v. Webster Bus. Credit Corp.*, 925 N.Y.S.2d 61, 70 (App. Div. 2011) ("The claims for unjust enrichment and money had and received are not viable because express contracts govern the same subject matter.").

### 10. Breach of Duty of Good Faith and Fair Dealing by SPS

Count Sixteen alleges a breach of the implied covenant of good faith and fair dealing by SPS. While this implied covenant is read into every contract under New York law, it is not distinct from the contract itself. *Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.*, No. 06 Civ. 5246 (JGK), 2007 WL 950134, at *6 (S.D.N.Y. Mar. 28, 2007). Therefore, "as a general rule, the cause of action alleging breach of the implied covenant is duplicative of a cause of action alleging breach of contract." *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, No. 98 Civ. 6907 (MBM), 2000 WL 335557, at *8 (S.D.N.Y. Mar. 30, 2000) (internal quotations and citations omitted). A claim for breach of the implied

---

[19] According to the Complaint, under the PSA "[t]he *servicer* has dominion and control over trust assets entrusted to its care." (FAC ¶ 16 (emphasis added).) If SPS unlawfully delegated its authority to the SPS Affiliates, the appropriate cause of action is for breach of contract, not conversion.

covenant can be maintained in conjunction with a breach of contract claim "only if the damages sought by the plaintiff[s] for breach of the implied covenant are not 'intrinsically tied to the damages allegedly resulting from breach of contract.'" *Id.* (quoting *Canstar v. J.A. Jones Constr. Co.*, 622 N.Y.S.2d 730, 731 (App. Div. 1995)).

Plaintiffs make no effort to distinguish their implied covenant claim from their contract claim. The Complaint's sparse pleading in support of this claim simply alleges that SPS "breached its duty of good faith and fair dealing by failing to act appropriately and in good faith to preserve the assets of the trust. Plaintiffs were damaged thereby, and Plaintiffs are entitled to recover their damages in connection therewith." (FAC ¶ 150.) Plaintiffs do not allege any damages for the breach of the implied covenant that are separate and distinct from those flowing from the breach of contract claim, and the claims themselves are functionally identical. Accordingly, the implied covenant claim warrants dismissal. *See W.S.A., Inc. v. ACA Corp.*, Nos. 94 Civ. 1868, 94 Civ. 1493 (CSH), 1996 WL 551599, at *9 (S.D.N.Y. Sept. 27, 1996) (observing that "every court" in this district addressing claims of breach of contract and breach of the implied covenant brought in the same complaint had dismissed the latter claim as duplicative); *Excelsior Fund, Inc.*, 2007 WL 950134, at *7; *Page Mill Asset Mgmt.*, 2000 WL 335557, at *9; *Alter v. Bogoricin*, No. 97 Civ. 0662 (MBM), 1997 WL 691332, at *3 (S.D.N.Y. Nov. 6, 1997).

11. Waste of Collateral

Count Seventeen asserts a claim against M&T and SPS for waste of collateral. Specifically, Plaintiffs allege that "[r]ather than . . . safeguard the property entrusted to their care, [SPS] and M&T caused and allowed the waste of the collateral for the loans involved in the Trusts. Plaintiffs were damaged thereby, and Plaintiffs are entitled to recover their damages in connection therewith." (FAC ¶ 152.) Defendants move to dismiss this claim, arguing that it is unavailable under New York law in the present context and duplicative of the breach of contract claims. (SPS Mem. 21; M&T Mem. 23.)

As the Second Circuit has observed, the equitable doctrine of waste of collateral evolved in the context of landlord-tenant relationships and was later expanded to permit an action by a mortgagee against a mortgagor. *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119-20 (2d Cir. 1994). Thus, New York courts have recognized two general categories of waste: first, "a substantive cause of action for waste against one in control of real property who does no more than allow the property to deteriorate and decrease in value . . . ," and, second, "a cause of action for waste by a mortgagee against a mortgagor who impairs the mortgage." *Id.* at 120 (citations omitted). Likewise, New York courts have also recognized that bondholders can bring an equitable action for "impairment of collateral" against the protectors of the collateral. *See Argonaut Partnership, L.P. v. Bankers Trustee Co. Ltd.*, No. 96 Civ. 1970 (MBM), 1997 WL 45521, at *6 (S.D.N.Y. Feb. 4, 1997) (noting that "New York law permits an action against the protector or trustee of collateral if the secured party claims that the collateral was impaired by the trustees' actions."); *see also Pioneer Commercial Funding Corp. v. United Airlines, Inc.*, 122 B.R. 871, 886-87 (S.D.N.Y. 1991); *Beck v. Mfrs. Hanover Trust Co.*, 481 N.Y.S.2d 211, 218 (Sup. Ct. 1984). Regardless of whether the tort is styled as a "waste" or "impairment" of collateral, a plaintiff must establish proof of

"(1) a wrongful act of the defendant; (2) impairment of security resulting from that act; and (3) the amount of such impairment." *117 West 58th St. Co. v. Crossland Savings FSB*, No. 117440/94, 001 (EJG), 1995 WL 500746, at *1 (N.Y. Sup. Ct. July 03, 1995) (citing *Syracuse Sav. Bank v. Onondaga Silk Co.*, 26 N.Y.S.2d 448, 451 (Sup. Ct. 1940)). Moreover, defendant's wrongful acts must stem from fraudulent or intentional conduct, as opposed to mere negligence or lack of due care and attention. *Id.*; *see also Travelers Ins. Co.*, 14 F.3d at 123 ("First, the failure [to comply with loan obligations] must be intentional or fraudulent. Second, the failure must result in the impairment of the security of the mortgage.").

Here, Plaintiffs have failed to allege a fraudulent or intentional impairment by M&T. The FAC does not assert a fraud claim against M&T and nothing in the pleadings plausibly suggests that M&T engaged in any fraudulent scheme leading to the impairment of the home equity loan pools. The closest the Complaint comes to making such an allegation is its assertion that "M&T . . . knew of Fairbanks' lawlessness, but did not protect the Owners in any way. Instead, [it] continued to profit from the trusts business and did not even notify the Owners of the problems." (FAC ¶ 80.) As noted above, however, Plaintiffs neither allege that M&T took kickbacks from SPS nor otherwise explain how removing SPS would have caused M&T to cease "profit[ing] from the trusts business." Especially when read in context with the rest of the Complaint, which stresses M&T's failure to "detect" the wrongdoing and audit SPS (*see, e.g.*, *id.* ¶ 93), this allegation fails to establish the predicate *fraudulent* or *intentional* act for a waste claim.

With respect to SPS, the allegation that it committed waste by failing to "safeguard the property entrusted to [its] care" (FAC ¶ 152) is actionable in contract, not tort. This claim stems from SPS's failure to abide by certain loan collection standards set forth in the PSA and the incorporated Fannie Mae Guide, which ultimately made it more difficult for Plaintiffs to collect on the mortgage loans. Plaintiffs cite no authority suggesting that Defendants could be liable for waste *even if* they complied with the PSA's servicing standards. Accordingly, the PSA plainly governs the subject matter of this claim and it is dismissed against both Defendants.

### 12. Accounting

Count Eighteen demands an accounting by all Defendants "of any and all amounts realized, the reason or basis for all amounts realized, and detailed information regarding all funds handled in any way concerning the Securitizations." (FAC ¶ 154.). To obtain an accounting under New York law, a plaintiff must show: "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (citation omitted). Because, as explained above, Plaintiffs have failed to allege the existence of a fiduciary or otherwise confidential relationship with SPS and M&T, much less the SPS Affiliates, the accounting claim merits dismissal. *See Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 323 (S.D.N.Y. 2010) ("[Plaintiff's] claim of breach of fiduciary duty and his request for an accounting fail because the Complaint does not allege adequate facts to suggest that the parties were in a relationship of sufficient trust and confidence to create either a

fiduciary duty or a confidential relationship."); *accord Sugarman v. Weisz*, 28 N.Y.2d 786 (1971); *Vill. of Hoosick Falls v. Allard*, 672 N.Y.S.2d 447, 449 (App. Div. 1998).

Even if Plaintiffs sufficiently demonstrated that they were in a fiduciary relationship with SPS and M&T, an equitable accounting claim cannot coexist with a breach of contract claim covering the same subject matter. *See Physicians Mut. Ins. Co.*, 2009 WL 855648, at *11 ("Although the accounting and equitable relief plaintiffs seek under this cause of action is different from the monetary damages they seek under the other claims we have deemed duplicative, this cause of action still arises from the same operative facts as plaintiffs' contract breach claim. As such, Count VII is likewise dismissed.") (internal citations omitted). The accounting requested here falls within the scope of the breach of contract claim under the PSA, and directly implicates the subject matter of the PSA's various disclosure and reporting requirements. (*See e.g.*, PSA §§ 7.08-7.10). Accordingly, Count Eighteen is dismissed.

### 13. Concealment

Because Plaintiffs agree with Defendants that Count Nineteen for "concealment" is not a "cause of action," but is simply factual pleading relating to a statute of limitations defense (Pls. SPS Opp'n 24), this claim is dismissed as a separate cause of action pursuant to Rule 41(a)(2).

### IV. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED IN PART AND DENIED IN PART.

IT IS HEREBY ORDERED THAT all causes of action in the Complaint are dismissed except for Count One (breach of contract against SPS) and Count Two (breach of contract against M&T).

IT IS FURTHER ORDERED THAT all portions of the Complaint concerning conduct by SPS and the SPS Affiliates prior to Plaintiffs' acquisition of their certificates in December 2004 are dismissed for lack of standing.

IT IS FURTHER ORDERED THAT all portions of the Complaint stated on behalf of the eighteen uncalled securitizations against SPS and the SPS Affiliates are dismissed for failure to comply with the contractual prerequisites for bringing suit in § 6.07 of the PSA.

IT IS FURTHER ORDERED THAT the parties shall submit a joint letter within 30 days of this Order, attaching a proposed case management plan and scheduling order. A template is available at http://www.nysd.uscourts.gov/cases/show.php?db=judge_info&id=347.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated:     December 2, 2011
           New York, New York

* * *

Plaintiffs Ellington Credit Fund, Ltd and ECF Special Securities, LLC are represented by Kell Corrigan Mercer, M. Daniel Guerra, and Stephen Wayne Lemmon of Brown McCarroll, LLP, 111 Congress Avenue,

34

Suite 1400, Austin, TX 78701, Patricia Baron Tomasco of Munsch Hardt Kopf & Harr, P.C., 600 Congress Avenue, Suite 2900, Austin, TX 78704, and David J. Grais, Leanne Marie Wilson, and Owen L. Cyrulnik of Grais & Ellsworth, LLP, 40 E. 52nd Street, New York, NY 10020.

Defendants Select Portfolio Servicing, Inc., Mountain West Reality Corp., Residential Real Estate Service, Inc., Alta Real Estate Services, Inc., Pelatis Insurance Agency Corp., are represented by Elizabeth K. Duffy, Benjamin David Foster, C. Don Clayton, Joseph Nicholas Froehlich, and Thomas G. Yoxall of Locke Lord Bissell & Liddell, LLP, 885 Third Avenue, 26th Flr. New York, NY 10022-4802.

Defendant Manufacturers and Traders Trust Company is represented by Amelia Berg, Paul S. Francis, and Marc Dennis Powers of Baker & Hostetler, 45 Rockefeller Plaza, New York, NY 10111